NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PAUL GERMANN & ASSOCIATES, | : |
| Plaintiff, | : **Hon. Dennis M. Cavanaugh** |
| v. | : **OPINION** |
| SPECIALTY FOOD MANAGEMENT GROUP, LLC, | : Civil Action No. 11-CV-1399 (DMC)(JAD) |
| Defendants. | : |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon Defendant Specialty Food Management Group's Motion for Partial Summary Judgment (ECF No. 42, Aug. 1, 2012). Pursuant to FED. R. CIV. P 78, no oral argument was heard. Based on the following and for the reasons expressed herein, Defendant's Motion is **denied.**

I.  **BACKGROUND**

This litigation relates to the interpretation of a contract for the purchase of an exclusive agency contract for the marketing of John McCann's oatmeal ("McCann's brand") in the United States. Paul Germann ("Germann"), through his solely owned entity, Plaintiff Paul Germann & Associates ("PGA" or "Plaintiff"), had a longstanding contract with Odlum Group, Ltd. ("Odlum") as the exclusive agent for the marketing and promotion of Odlum's McCann's brand in the United States. In 2005, Germann decided that to retire and sought a buyer for his contract

with Odlum. Germann met with Allen Schnapp ("Schnapp"), the owner of New World Marketing Group, Inc.[1] n/k/a Specialty Food Marketing Group, LLC (hereinafter referred to as "Specialty" or "Defendant") about the potential for Specialty to purchase PGA's contract with Odlum.

Schnapp and Germann agreed that the purchase price would be $1,050,000 and the terms were memorialized in the August 1, 2006 "Assignment and Assumption of Contract Between Paul Germann & Associates, Inc. and New World Marketing Group, LLC" (the "Assignment Agreement").

The Assignment Agreement provided for a $1,050,000 purchase price (the "Purchase Price") to be paid in five payments: four payments of $225,000 in 2006, 2007, 2008 and 2009, and a final payment of $150,000 in 2010. The parties included provisions for upward and downward adjustments to the Purchase Price based upon actual commissions earned each year, as well as a bonus of $50,000 to be paid in August of 2011, if a certain sales threshold was met. The upward and downward adjustments were designed to ensure that the commissions were equally split between the parties during the contract's term.

The Assignment Agreement included a termination provision that expressly provided for the proration of "all amounts due" and any upward or downward adjustments through the date of termination. How proration should be calculated and when termination of the Assignment Agreement occurred are the two disputed issues in this litigation.

---

[1] In December 2006 New World Marketing Group changed its name to Specialty Food Management Group, LLC, ("Specialty"), thus any mention of New World in the August 2006 Assignment Agreement refers to Specialty.

Contemporaneous with the execution of the Assignment Agreement, PGA, Specialty and Odlum executed a letter agreement providing for exclusive marketing, sales and promotional rights to Specialty as assignee of PGA (the "Odlum Contract"). By virtue of the Odlum Contract, Odlum approved Specialty as the exclusive marketing agent for the McCann's brand in the United States as of August 1, 2006. The Odlum Contract did not contain any specific provision to address a sale of the McCann's brand by Odlum to another company, an eventuality that would occur during the term of the Assignment Agreement. On September 25, 2008, Odlum sold the McCann brand to Sturm.

PGA filed this lawsuit in the Superior Court of Bergen County on January 21, 2011. (ECF No.1). Notice of removal to this Court was filed on March 14, 2011. The Complaint alleges that "in breach and violation of its duties and obligations pursuant to the Contract, Specialty Food has failed and refused to pay to Germann the consideration required to be paid up to September 30, 2009, under the Contract, notwithstanding Germann's demand for payment of the same." (Compl. ¶ 15, ECF No. 1-1). Further, PGA demands payment of the late fee for each late payment allegedly made by Specialty. In addition to breach of contract, PGA also alleges Specialty breached the implied duty of good faith and fair dealing, and alleges unjust enrichment.

## II.   STANDARD OF REVIEW

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). The moving party bears the burden of showing that there is no genuine issue of fact. Id. "The burden has two distinct components: an

initial burden of production, which shifts to the non moving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." Id. The nonmoving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. See FED. R. CIV. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences - including issues of credibility - in favor of the nonmoving party." Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D.N.J. 2000), aff'd, 51 Fed. App'x 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

## III. DISCUSSION

PGA's lawsuit seeks recovery of monies Specialty has allegedly refused to pay pursuant to the Assignment Agreement. The parties disagree on what is owed and how the amount owed must be calculated.

### A. Termination of the Assignment Agreement

Section 17 of the Assignment Agreement states:

> in the event (i) Odlum terminates the Odlum Contract or ceases to do business with New World for any reason... then the assignment shall terminate with written notice to New World and New World shall have no further liability to Germann, subject, however, to the provisions of Section 2 and further subject to New World's obligation to remit to Germann all amounts due under Section 3, hereunder prorated to the date of termination, after giving effect to any upward or downward adjustment as provided for the [sic] in Sections 5 and 6 above calculated on a pro rate basis.

4

(Pl.'s Br., Exh. 6.) Thus, the Assignment Agreement would terminate when "Odlum terminates the Odlum Contract or ceases to do business with New World for any reason." Specialty argues that both events occurred on September 25, 2008, when Odlum sold the McCann's brand to Sturm, thereby triggering the termination of the Assignment Agreement on September 25, 2008. (Def.'s Br. 24). PGA states that the contract was terminated on September 30, 2009. PGA directs the Court's attention to a letter from Odlum to Specialty dated September 25, 2008, which notified Specialty that Odlum was terminating the contract in one year, pursuant to the Section 2 termination provision of the Odlum Contract. That section states "in the event that the agreement is not extended beyond 31st July 2007, the Principal must give 12 months notice of termination of the contract in writing to the Agent and/or the Assignee." (Pl.'s Opp'n 5). PGA's Complaint seeks compensation for the payments Specialty has allegedly failed to pay up to September 30, 2009. The Court will address Specialty's arguments in turn.

### 1. Whether Odlum "ceased to do business" with Specialty after the sale to Sturm

Specialty argues that "as both a logical and practical matter, once Odlum sold the McCann's brand to Sturm there was no further business between Odlum and Specialty Food," thereby terminating the Assignment Agreement. (Def.'s Br. 28). PGA asserts that Odlum did not cease doing business with Specialty, because PGA can establish the Odlum Contract was assigned to Sturm. Specialty denies that its services provided to Sturm were related to or governed by either the Odlum Contract or the Assignment Agreement, instead alleging that Specialty worked for Sturm pursuant to a verbal consulting agreement.

Specialty admits that Odlum did remit payments of commissions to Specialty after the September 25, 2008 sale, but allege that the commissions were not for work Specialty did for

Sturm, but were for sales that occurred prior to September 25, 2008. (Id.) Specifically, Specialty claims that the only interactions it had with Odlum after the sale "related to Specialty's efforts to recoup unpaid commissions due Specialty Food from Odlum for McCann's product sales that occurred prior to Odlum selling the brand to Sturm and in connection with Specialty Food's effort to help Odlum and their U.S distributor resolve a dispute over a marketing spend that also occurred prior to Odlum selling the brand to Sturm." (Id.) Specialty claims they were not compensated for this work.

However, there is evidence that Specialty acted in a manner consistent with their obligations under the Odlum Contract after Odlum sold the McCann's brand to Sturm, and did not have a separate consulting agreement. The U.S. distributor for McCann's for Odlum and for Sturm, after Sturm's purchase of McCann's, was World Finer Foods, Inc. ("WFF"). Frank Muchel ("Muchel"), President and CEO of WFF, and Todd Newstadt ("Newstadt"), Vice President of Marketing for WFF, testified that subsequent to the sale of McCann's to Sturm and while Speciality was working for Sturm, WFF continued to supply Schnapp in late 2008 and 2009 with exactly the same sales projections, plans, and reports as it had provided to him when Odlum owned McCann's. (See Pl's Opp'n 8, Exh. B to Wiss Cert., 6:4-8 and 39: 15-21; Exh. C to Wiss Cert., 9:14-24 and 21:7 to 22:13). Additionally, according to Scott Gerhartz ("Gerhartz"), Sturm's former comptroller and former member of the due diligence committee for Sturm, Specialty was compensated, at Gerhartz's instruction, exactly as required by the Odlum Contract, up until September 2009. (Gerhartz Aff. ¶¶ 21, 25). Commissions equal to seven percent of the sale's of McCann's made by Sturm were paid by Sturm to Speciality, as required by the Odlum Contract. (Germann's Aff. ¶).

6

However, Larry Hamwey ("Hamwey"), a former Vice President of Marketing for Sturm, admitted that while he was not involved in the legal or financial terms of Sturm's acquisition of the McCann's brand, he had knowledge that Sturm "did not ask Specialty Food to perform any sales and marketing services with respect to the McCann's brand and Sturm did not pay Specialty Food for any sales or marketing services." (Hamwey Aff. ¶ 14).

In support of the claim that Odlum in fact assigned the Odum Contract to Sturm upon the sale, PGA cites to the Affidavits of Gerhartz and Mike Upchurch ("Upchurch"), former CEO of Sturm. Upchurch testified that the only reason Sturm utilized the services of Schnapp and Specialty was because it was obligated to do so under the Odlum Contract. (Upchurch Aff. ¶ 9). Additionally, Upchurch testified that Sturm's due diligence committee specifically determined, and subsequently updated the Board of Directors, to the fact that the Odlum Contract could not be terminated until September 30, 2009 (Upchurch Aff. ¶ 6).

Gerhartz testified that the Sturm due diligence committee determined that the Odlum Contract was a contract that Sturm was required to honor, "because it was being assigned from Odlum to Sturm during the acquisition of the McCann's brand." (Gerhartz Aff. ¶ 5).

Specialty argues that "Sturm asked Specialty Food to provide consulting services to allow for a smooth transition between Odlum and Sturm." (Def's Br. 21, Hamwey Aff. ¶ 15-16), and that the monies that Specialty received from Sturm were not subject to the terms of the Assignment Agreement because they were not earned pursuant to the Odlum Contract and not earned for work as an exclusive marketing agent, but for consultation services. (Def.'s Reply 7). Hamwey further testifies that "to ensure a smooth transition, Specialty Food and Sturm reached an understanding that Specialty Food would be compensated for Schnapp's consulting expertise

7

and advice by virtue of an override of commissions from sales of the McCann's brand, other than the sales made by Sturm to Trader Joe's." (Hamwey Aff. ¶ 22). In Specialty's supporting affidavit, Hamwey testified that he was "never advised by anyone at Sturm that Sturm had assumed any contract between Specialty Food and Odlum or that Specialty Food's contract with Odlum had been assigned to Sturm." (Hamwey Aff. ¶ 14). However, Gerhartz denies there was an understanding between Speciality and Sturm regarding a consulting agreement, testifying that as the corporpate comptroller for Sturm, he would have been privy to such an agreement. (Gerhartz Aff. ¶ 19). Gerhartz also testified that Hamwey never informed him of any such agreement. (Id. ¶ 20).

This Court finds that there are material issues of fact as to whether Specialty continued doing business with Odlum after the sale of the McCann's brand. The facts cited by the parties are in direct contradiction of each other, and thus it is not appropriate at this time for the Court to determine whether Odlum ceased to do business with Specialty. The issues of Specialty's continued relationship with Odlum post sale, and the possible assignment of the Odlum Contract preclude summary judgment on the issue of whether or not the Assignment Agreement terminated immediately on September 25, 2008 due to Odlum's ceasing to do business with Specialty.

### 2. Whether the Principal Purpose of the Contract was Frustrated

Specialty also argues that the principal purpose of the Odlum contract was frustrated when Odlum sold the McCann brand to Sturm. (Def.'s Br. 26). Specialty states that the principal purpose of the Odlum contract was to "approve the assignment by PGA to Specialty Food so that Specialty Food could act as Odlum's exclusive agent in the United States as of August 1, 2006."

(Id.) Specialty argues that this purpose was frustrated by the sale as Odlum no longer owned the McCann's products and thus had no obligation to compensate Specialty as an exclusive agent under the Odlum contract or for Specialty to continue as the exclusive agent to market the McCann's brand for Odlum. (Id. at 27). Specialty also cites to Restatement (Second) of Contracts 317(2)(a) for a similar argument: that the contract could not be assigned because such an assignment would materially change Specialty's duties.

PGA argues that the principal purpose of the Odlum Contract was for Specialty to provide services to Odlum ". . . in as much as they are required by the Principal." (Pl's Opp'n 22-3, (citing Odlum Contract, Exh. B)). While PGA denies that Sturm, as the Principal, limited Specialty's services or changed Specialty's role in the contract, "to the extent that same was true, same was fully permissible and not a frustration of the purpose of the Odlum Contract." (Pl.'s Opp'n 23).

As both parties note, to excuse performance, the Restatement (Second) of Contracts requires that any frustration be "substantial," and Connecticut law holds that the contract's objective must be "utterly defeated." Wheelabrator Envtl. Sys. Inc. v. Galante, 136 F. Supp. 2d 21, 34 (D. Conn. 2001). "A party claiming that a supervening event or contingency has frustrated, and thus excused, a promised performance must demonstrate that ... the event substantially frustrated his principal purpose [and that] the nonoccurrence of the supervening event was a basic assumption on which the contract was made . . . ." O'Hara v. Connecticut, 590 A.2d 948, 954 n.7 (Conn. 1991) (citing Restatement (Second), Contracts § 265). "[T]he event upon which the obligor relies to excuse his performance cannot be an event that the parties foresaw at the time of the contract." O'Hara, 590 A.2d at 954.

9

The Court finds there are issues of fact as to whether Odlum's sale of the McCann brand to Sturm frustrated the principal purpose of the contract. While the Odlum Contract contained no provision against sale or assignment, making it foreseeable that either of these events could occur, as noted above, there is a question of fact as to whether Specialty acted in a manner consistent with their obligations under the Odlum Contract after the sale. (See Pl's Opp'n, Ex. B to Wiss Cert., 6:4-8 , 39:15-21 and 45:21 to 46:2; Ex. C to Wiss Cert., 9:14-24 and 21:7 to 22:13). If Specialty did continue its business with Odlum, it cannot be said that the Contract was frustrated.

### 3. Whether the Contract Terminated in September 2009

PGA argues that "as confirmed by Odlum's September 25, 2008 letter, and by the Gerhartz Affidavit, it was Odlum, prior to the assignment of the Odlum Contract to Sturm, that terminated said contract on one year's notice effective September 24, 2009." (Pl.'s Opp'n 6-7). Section 2 of the Odlum Contract provides that "in the event that the agreement is not extended beyond 31st July 2007, the Principal must give 12 months notice of termination of the contract in writing to the Agent and/or the Assignee."

Section 16, the other section of the Contract dealing with termination, provided other bases which allow for immediate termination of the Contract. In relevant part, it provides

> 16. Notwithstanding the provisions of Clause 2, the Principal may, by notice to the Agent/ Assignee, terminate this Agreement immediately upon the happening of any of the following events:
>     iii) if the Agent's/ Assignee's ability to carry out it's obligations hereunder is prevented or substantially interfered with for any reason whatsoever (whether or not within the control of the Agent/ Assignee), including without limitation by reason of any regulation law decree, or any act of state or other action of the government.

10

Gerhartz testified that Sturm did not believe that the purchase of the McCann brand triggered any of the immediate termination bases, including subsection (iii), and if they believed it was possible, Sturm would have terminated immediately. (Gerhartz Aff. ¶¶ 9, 12). He claims that because Sturm and Odlum could not terminate immediately, the September 25, 2008 letter from Odlum to New World terminating the Odlum Contract on one year's notice pursuant to Section 2, was sent as his personal direction as part of the sale. (Id. at ¶¶ 13-14.)

As established above, there are clear issues of fact as to whether the sale of the McCann's brand to Sturm frustrated the principal purpose of the Odlum Contract; if the fact finder determines that the contract was in fact frustrated, it could also find that Specialty's ability to carry out its obligations were substantially interfered with.

The Court finds there are issues of material fact as to the date of the termination agreement. There is conflicting evidence as to whether the Odlum Contract was terminated as of Septmeber 25, 2008, the date of Odlum's sale of the McCann's brand to Sturm, and thus Specialty continued to work with Sturm pursuant to an independent consulting agreement, or that Odlum properly terminated the contract by written notice one year prior to the termination date of September 2009, and Specialty continued to do business with Sturm as the assignee of the Odlum Contract under Odlum. Thus summary judgment as to the issue of the date of termination is improper at this time, and is denied.

**B.     Proration Calculation**

Section 17 provides that in the event Odlum terminates the Odlum Contract or ceases to do business with Specialty, or Specialty fails to make any payment within 30 days such payment is due, then the assignment is terminated, and Specialty has no further liability to Germann,

> subject however to the provisions of Section 2, and further subject to New World (Specialty)'s obligation to remit to Germann **_all amounts due_** under Section 3 hereunder prorated to **_the date of termination_**, after giving effect to any upward or downward adjustment as provided for the [sic] in Sections 5 and 6 above calculated on a pro rate basis.(Emphasis added).

The parties disagree on what amount of monies are to be prorated and what formula should be used to prorate the remaining monies due.

Specialty urges this Court to first find that the contract length was 5 years, not 4 years as argued by PGA, and to prorate the entire purchase price of $1,050,000 over the 5 years to find a monthly value.

The Court agrees with Specialty that the contract contemplated payment for 5 years, and not 4. The payment schedule was in installments, pursuant to Section 3, as follows:

> The Purchase Price to be paid by New World to Germann shall be One Million Fifty Thousand ($1,050,000.00) Dollars, subject to upward or downward adjustments to purchase price as provided for in Section 5 and 6. New World shall pay the Purchase Price in installments by delivery in the following manner:
> (a) Two Hundred Twenty Five Thousand ($225,000.00) Dollars in cash by wire transfer to Germann on October 1, 2006;
> (b) Three (3) annual installments of Two Hundred Twenty Five Thousand ($225,000.000) Dollars in cash by wire transfer to Germann on August 1, 2007, 2008 and 2009; and
> (c) A final installment of One Hundred Fifty Thousand ($150,000.00) Dollars in cash by wire transfer to Germann on August 1, 2010.
> (d) A late charge of five (5%) shall be accrue and be payable for any payment of Purchase Price not made on the date due. Such late charge shall being to accrue as of the due date of the installment.

The payments were to start in October 1, 2006, and one installment to be made in 2007, 2008, 2009, and 2010. In addition, under Connecticut law, parol evidence may be admitted to aid in contract interpretation where it is relevant to explain an ambiguity appearing in the instrument, to prove a collateral oral agreement which does not vary the terms of the writing, to add a missing

term in a writing which indicates on its face that it does not set forth the complete agreement, or to show mistake or fraud, but it may not be admitted to vary or contradict the written terms of an integrated contract. Quiello v. Reward Network Establishment Services, Inc., 420 F. Supp. 2d 23 (D. Conn. 2006). In this case, the parol evidence establishes a purchase price for PGA's contract with Odlum based upon five years of commission payments. Specialty cites to emails dated May 1, 2005, between Germann and Schnapp, confirming they agreed to a contract of 5 years, and Germann's email of January 27, 2010, where is admits "[m]y contract with Allen [Schnapp] was for 5 years." (Def.'s Br. 20).Additionally, if the Court construes the contract to be 4 years in length, Section 17 would have no meaning in the fifth year of the Assignment Agreement. Specialty provided an example in its moving brief that illustrates this point:

> For example, if Odlum did not sell the brand in September 2008 but instead ceased doing business with Specialty Food in September 2010, two months into the fifth year of the Assignment Agreement, Section 17 would still require that the Purchase Price be prorated through the September 2010 date of termination.

(Def.'s Br. 15). The Court agrees with Specialty that a reasonable construction of the ordinary meaning of Section 17 results a five year long contract.

However, the Court disagrees with Specialty that the entire purchase price should be prorated. The language of the contract is clear: Specialty was to remit to PGA "all amounts due under Section 3 hereunder prorated to the date of termination" and adjusted pursuant to Sections 5 and 6. The Court is not convinced that "all amounts due" was intended to mean the entirety of the purchase price, and instead agrees with PGA's interpretation that there is no basis to "prorate the monies that were already due to PGA while contract terms were in effect. This means that if monies were due and owing until Section 3 by certain due dates, they need to be paid to PGA

under the clear and unambiguous terms of the Odlum Contract." (Pl.'s Opp'n 28). PGA argues that because Section 3 had specific due dates relating to payment, thus the only way "all amounts due" can be given meaning is by "virtue of its plain language: if money was due, it must be paid in full; if money was yet to be due, it must be prorated."

Because the Court determined that an issue of fact exists as to the date of termination, the proration analysis cannot be taken to the final step. However, the Court agrees with the example provided by PGA in their moving brief, which proves instructive if the date of termination is deemed to be September 25, 2009. PGA's calculation is as follows:

> 1) A payment in the amount of $225,000 on October 1, 2006; FULL AMOUNT OF $225,000 DUE – Due Date Passed – No Pro Rating
> 2) Three (3) installments of $225,000 each, payable on August 1, 2007, August 1, 2008 and August 1, 2009, respectively totaling $675,000; FULL AMOUNT OF $675,000 DUE – Due Date Passed – No Pro Rating
> 3) One (1) final installment of $150,000 on August 1, 2010 - Amount remaining
>
> $150,000 remaining under the Assignment is prorated from September 30, 2009 (effective termination date).
>
> There was only one payment remaining to be paid as of September 30, 2009, i.e., a last payment in the amount of $150,000.
>
> Therefore, the Assignment was in effect two months into the remaining term of the Assignment (August and September), and PGA is entitled to 1/6th (2 of 12 months) of $150,000 or $25,000.

Based solely on Section 3 (and not any of the other Sections which must also be prorated), PGA would be entitled to $925,000 ($225,000, $675,000, plus $25,000) if the contract was deemed terminated on September 25, 2009. If the contract is deemed terminated on September 25, 2008, as argued by Specialty, the calculation would be as follows:

> 1) A payment in the amount of $225,000 on October 1, 2006; FULL AMOUNT OF $225,000 DUE – Due Date Passed – No Pro Rating

14

2) Two (2) installments of $225,000 each, payable on August 1, 2007 and August 1, 2008 respectively - Due Date Passed - No Pro Rating
3) One (1) installment of $225,000, payable on August 1, 2009.
4) One (1) installment of $150,000 on August 1, 2010.

$150,000 + $225,000 = $375,000 remaining under the Assignment is prorated from September 25, 2008 (effective termination date).

There were two payments remaining to be paid as of September 25, 2008, i.e., two payments in the amount of $375,000.

Therefore, the Assignment was in effect two months into the two remaining terms of the Assignment (August and September of 2008, in addition to the entirety of 2009-2010)

PGA is entitled to 1/12th (2 of 24 months) of $375,000 or $31,250.

### C. Whether Speciality Breached the Assignment Agreement

PGA alleges three separate causes of action: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) unjust enrichment.

The Court finds there are genuine issues of material fact that preclude summary judgment in favor of Specialty on the issue of whether it breached the Assignment Agreement. The evidence shows that Specialty never communicated to PGA its position that Specialty considered the Odlum Contract terminated as of September 25, 2008. Whether or not an assignment of the Odlum contract was implied or implicit is a question of fact that must be left to the fact finder. Finally, if the contract did in fact terminate in September of 2009, and Speciality continued to perform the same services to Sturm, Specialty could be in both breach of contract and acting in bad faith towards PGA. Based on the contrasting evidence presented by the parties, it is not the role of the Court to determine what is more credible and grant summary judgment on the issue of whether Speciality was in breach of the Assignment Agreement.

15

**D.     Late Charges**

PGA also seeks late charges pursuant to the Assignment Agreement in connection with the purported late payments made by Specialty. Specialty contends that there are no late charges, and even if payments were made late, the late charges included in the Assignment Agreement are an unenforceable penalty provision that should be declared void as against public policy. The Assignment Agreement sets forth the following provision in Section 3:

> The Purchase Price to be paid by New World to Germann shall be One Million Fifty Thousand ($1,050,000) Dollars, subject to upward or downward adjustments to purchase price as provided for in Section 5 and 6 below. New World shall pay the Purchase Price in installments by delivery in the following manner:
> ...
> (a)A late charge of five (5%) percent shall be accrue and be payable for any payment of Purchase Price not made on the date due. Such late charge shall begin to accrue as of the due date of the installment.

"Late charges are allowable in contracts as liquidated damages if the puporse of hte late charge is to compensate a party for another party's delay in making payments." McKeever v. Fiore, 829 A. 2d 846, 854 (Conn. App. Ct. 2003). The general rule under Connecticut law is that late charges are permitted, unless they are "excessive and do not bear a reasonable relationship to the actual damages sustained," and the charges are then rendered void as a penalty. McKeever, 829 A. 2d 854.

Specialty alleges that Germann's testimony proves that the late charges are an unenforceable penalty. (Def.'s Br. 35). Germann testified as follows:

> Q. Did you ever write him a letter saying that you wanted your payments and you wanted the late charges associated with the late payments?
> A. I don't believe so. You have to understand, I was just happy to get my money. I wasn't concerned about the late payments, all right?
> Q. But you're now looking for the late payments as well?
> A. Yes, I am now, because I deserve that, yes.

16

> Q. What were the late payments intended to compensate for?
> A. For late payment.
> Q. ... Were you incurring some sort of expense as a result of him making the payments late?
> A. No, it was designed as an incentive for him not to be late.
> Q. Incentive. Do you mean punishment?
> A. No, an incentive for him to pay on a timely basis, not punishment necessarily. If he had paid on time, then there wouldn't be any problem. It was in the contract.

(See Grantz Cert., Exh. 1, Germann Dep. 105:6-25 - 106:1-8). The Court does not agree with Specialty that the late charges in the Assignment Agreement are a penalty and void as against public policy. This Court finds that if it is determined that Specialty was late in the payments they were required to furnish to PGA, the contractually mandated late charges are permissible under Connecticut law.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **denied**. An appropriate Order accompanies this opinion.

s/Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date: March 26, 2013
Original:   Clerk's Office
cc:         All Counsel of Record
            The Honorable Joseph A. Dickson, U.S.M.J.
            File